Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 4704 | DATE | April 14, 2003 |
| CASE TITLE | Emma Wright    v    Hollywood Casino-Aurora | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]

Defendant's motion for summary judgment is granted its entirety. Plaintiff's motion for appointment of counsel is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| X | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | APR 2 2 2003 | |
| | Notified counsel by telephone. | | date docketed | SS |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| GDS | courtroom deputy's initials | 03 APR 21 PM 3:55 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
APR 2 2 2003

EMMA L. WRIGHT,                    )
                                    )
            Plaintiff,              )
                                    )    No.   01 C 4704
       v.                           )
                                    )    Judge Robert W. Gettleman
HOLLYWOOD CASINO-AURORA,            )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Emma Wright[1] filed the instant suit against her former employer, Hollywood Casino-Aurora ("HCA"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. Defendant moved for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons stated herein, defendant's motion is granted in its entirety.

---

[1]On February 5, 2003, while the instant motion was pending, plaintiff's appointed attorney moved to withdraw from representation on the basis of Local Rules 83.38(3) and 83.38(5). Local Rule 83.38(5) provides that appointed counsel may be relieved of appointment when, "in counsel's opinion the party is proceeding for purpose of harassment or malicious injury, or the party's claims or defenses are not warranted under existing law and cannot be supported by good faith argument for extension, modification, or reversal of existing law." Plaintiff, although properly notified of the motion to withdraw, failed to appear. The court granted the motion to withdraw in open court, and mailed notice to plaintiff. Plaintiff subsequently mailed a letter to the court, which was neither filed nor docketed, requesting the appointment of substitute counsel. On April 9, 2003, plaintiff filed another motion for appointment of counsel, which the court denies. Thus, as of the date of this opinion, plaintiff is proceeding pro se.

## FACTS [2]

In 1999, HCA's Assistant Manager of Operations, Robert Casas, interviewed plaintiff, an African-American woman, and recommended that HCA hire her. Thereafter, from May 24, 1999, to January 2, 2001, plaintiff worked as a third shift housekeeper for HCA's Stage Crew Department (also known as the Housekeeping Department). On the date of her termination, plaintiff was 72 years old. In her deposition, plaintiff acknowledged that her employment was at-will, and HCA could therefore terminate her employment at any time, without reason or notice.

During 2000, the housekeeping department was managed by Kathy Brakebill, a non-Hispanic woman whose date of birth is December 17, 1954. Plaintiff's supervisors included Gilbert Ramos, a Hispanic male whose date of birth is December 29, 1968, and James Jeffries, an African-American male whose date of birth is September 15, 1943. The "crew leaders" assigned to the third shift in 2000 included Herlinda Arrendondo, a Hispanic female whose date of birth is February 14, 1956, and Tony Padilla, a Hispanic male whose date of birth is April 9, 1942.

According to plaintiff's deposition testimony, HCA provided her with a two or three day orientation session shortly after she was hired. During the orientation session, plaintiff received written literature regarding HCA's policies, such as HCA's "Hooray for Hollywood" booklet and HCA's "Cast Member Handbook" ("Handbook"), both of which contain HCA's "Open Door Policy." In May 1999, plaintiff signed a document acknowledging that she received and understood the handbook. In September 1999, after receiving a revised Handbook, plaintiff signed another document acknowledging that she received and understood the revised Handbook.

---

[2]This factual summary is drawn from defendant's Local Rule 56.1(a)(3) Statement of Material Facts About Which There are No Genuine Issues, to which plaintiff has not responded or otherwise pled.

The "Open Door Policy" provides that employees may speak to any member of management regarding issues of concern and may request strict confidentiality. HCA also maintains a "Cast Member Help Line" that allows employees to talk in confidence about work-related problems with a member of the Human Resources Department. During her employment, plaintiff never called the Cast Member Help Line.

If an HCA employee does not feel that the Open Door Policy has satisfactorily resolved a workplace issue, then she may initiate the "Fair Treatment" process, which involves informal discussion, conference, conciliation meeting, and review by the Board of Review. Under this process, an employee who has reasons to dispute a record of corrective action is required to bring the matter to his supervisor's attention within three calendar days of the alleged occurrence or dispute. Plaintiff acknowledged in her deposition that she was familiar with both the Open Door and Fair Treatment policies.

HCA's Lost Time Policy and Plaintiff's Absences

HCA's Lost Time Policy states that regular, predictable and on-time attendance at work is expected and necessary for the successful operation of HCA, and provides that severe corrective action, "up to and including termination of employment," may be taken in response to lost time. Each absence under the Lost Time Policy remains active for one year and within that year counts towards Lost Time corrective action. Generally, employees who have completed three months of employment with HCA are issued a written record of coaching after seven absences, a written record of corrective action after eight absences, and are terminated after nine absences.

An employee is charged with an "absence" if he or she, (1) is unavailable for a full shift and has notified his/her department head at least two hours prior to the start of his/her shift, (2)

3

reports to work more than three hours after the start of her shift, or (3) requests to leave early and has not completed at least four hours of his/her shift. A sick day (or series of continuous sick days) counts as one absence under HCA's Lost Time Policy. Calling in absent on Friday or Saturday, or being absent from one's designated shift on an HCA-designated holiday, "mandatory day," or "Important Business Day," counts as two absences. A "no call/no show" absence, in which the employee does not notify HCA that she will be absent, also counts as two absences; the Lost Time Policy states that HCA will terminate employees who accrue two no call/no shows within a twelve-month period.

A "mandatory" day is one during which all employees are expected to work, regardless of their regular days off. In the Housekeeping Department, December 31 and January 1 are mandatory days. In early December 2000, HCA issued a holiday reminder stating that "Sunday 12/31/00, Monday 01/01/00 [sic] are Mandatory work days for all cast members. Cast Members that have Sundays and/or Mondays off, must also work. They will have other days designated off for that week only." (Emphasis omitted.) This reminder was posted on a bulletin board in a janitor's room known as the "J-closet," where work schedules for Housekeeping Department employees are regularly posted. Plaintiff testified in her deposition that she did not see the reminder, however. Nonetheless, in her deposition, plaintiff did not dispute that HCA provided her with written information regarding the mandatory days and that she therefore already knew "what to do, what not to do."

On October 29, 1999, plaintiff received a written record of counseling after receiving her seventh absence on October 22, 1999. The written counseling stated, in part, that two more absences before June 15, 2000, would result in termination. Plaintiff refused to sign the record

4

of counseling and wrote in the employee comments section that "I'm sure this incorrect. I have not called in absence on my regular day." Plaintiff did not inform the human resources department or Brakebill about her dispute, however.

On December 1, 1999, after an eighth absence on November 29, 1999, plaintiff received a written warning. In the comments section, plaintiff wrote, "This is incorrect," and refused to sign the warning. Again, she did not inform human resources or Brakebill about her dispute.

On May 22, 2000, plaintiff was absent from work and did not call or notify anyone at HCA that she would be absent. This no call/no show brought plaintiff's absences to ten, and HCA gave plaintiff a record of counseling indicating that she was being suspended without pay and recommended for termination. In response, plaintiff informed HCA that she was absent on May 22 because her car had been broken into. Although Brakebill believed that plaintiff could have called in to let HCA know she would not be coming to work, Brakebill reversed the termination decision and allowed plaintiff to continue working. Brakebill also counted the May 22, 2000, absence as one infraction, rather than two.

Plaintiff's June 2000 performance evaluation stated that plaintiff "needs to work on her attendance." On June 15, 2000, plaintiff called in sick to work; she was not paid for that day, but disputes that she was absent from work. HCA counted June 15, 2000, as an absence under its Lost Time Policy. Plaintiff received a written warning shortly thereafter, which she signed. In the comments section, she noted, "It has been over six months since I called off. I was sick with a cold and came to work... I don't understand the call off." Plaintiff did not complain to human resources or Brakebill about her dispute, however.

Plaintiff was absent on June 26, 2000, and HCA's absence tracking sheet, filled out by Supervisor Ramos, shows that plaintiff was a no call/no show, which counts as two absences. Plaintiff called in two more absences on July 20, 2000, and September 5, 2000. The absence tracking sheet also showed that plaintiff was absent due to illness on "September 27" (no year included), although plaintiff did sign into work on September 27, 2000. On October 5, 2000, plaintiff received a written warning stating that her absence on "September 27" brought her absences to 8.5 and that one-half more absence before November 29, 2000, would result in termination. Plaintiff signed the written warning, did not include any comments, and did not dispute the warning with human resources or Brakebill. Before signing the warning, Casas verified that plaintiff was indeed absent on September 27, 2000.

On October 5, 2000, plaintiff called in sick, which counted as one absence. On December 28, 2000, plaintiff again called in sick and accrued an additional absence.

The housekeeping department employee schedule for the week beginning Monday, January 1, 2001, indicated that all third shift Housekeeping employees, including plaintiff, were scheduled to work on New Year's Day, 2001. The schedule states that New Year's Day is a "mandatory" day. According to plaintiff, when she left work on Sunday, December 31, 2000, the schedule was not posted in the J-closet. After she failed to show for work on January 1, 2001, her supervisor filled out an absence tracking form showing that plaintiff was a no call/no show, which counts as two absences. On January 3, 2001, plaintiff received a record of counseling indicating that she was being recommended for termination because she had accrued ten absences. The counseling noted that plaintiff had been warned several times about her attendance, and "was also given a break."

6

Plaintiff's housekeeping department file contains absence tracking sheets showing that plaintiff was absent on May 22, 2000, June 15, 2000, June 26, 2000, July 20, 2000, September 5, 2000, October 5, 2000, December 28, 2000, and January 1, 2000.[3] HCA's payroll department records confirm that plaintiff was not paid for work on any of these dates. Of the days on which plaintiff was absent, the June 26 and January 1 absences were documented as no call/no shows, each of which counts as two absences; as noted earlier, the May 22 absence was reduced to one absence after plaintiff explained that she was absent due to car trouble.

Brakebill and Casas made the decision to terminate plaintiff's employment based on their belief that plaintiff had accrued more than nine absences under HCA's Lost Time Policy and two no call/no shows within a twelve-month period. Brakebill conferred with Human Resources and HCA's in-house legal counsel before making the decision to terminate plaintiff's employment. Plaintiff admits that her attendance record did not meet HCA's expectations. Although she complained to the human resources department, plaintiff did not write a letter of appeal to the board of review, as provided for under HCA's Fair Treatment Policy.

Of the 49 employees terminated under HCA's Lost Time Policy between 1998 and 2000, 21 employees were Hispanic, 37 were under the age of forty, and 22 were male. Moreover, between 1998 and 2000, plaintiff was the only employee in the housekeeping department who was allowed to return to work after accumulating more than nine absences.

J-Closet Incident

Plaintiff testified in her deposition that on October 14, 2000, as she was in the J-Closet and heading out to the hallway to begin her shift, crew leader Arrendondo pushed her from

---

[3]Plaintiff's file also contained an absence tracking sheet dated "September 27" (no year).

behind, causing plaintiff to fall on her knees and hands. Plaintiff further testified that when she looked up, Arrendondo was laughing at her and proceeded to speak to two supervisors outside the J-closet "in whatever language."[4] Later that night, plaintiff complained to Supervisor Ramos. When Ramos spoke to Arrendondo, she explained that she did not intentionally push plaintiff, but that she had accidentally bumped into plaintiff while carrying a stack of towels out of the J-closet. Moreover, Arrendondo indicated that she had apologized to plaintiff.

Ramos and Brakebill conducted an investigation into the incident. Co-workers Martina Perez and Maria Ochoa and Supervisors Claudia Moreno and Deborah Nunez, identified by Arrendondo as witnesses to the incident, gave statements to HCA, either confirming that Arrendondo had not intentionally pushed plaintiff or stating that they had not seen the incident. None of the witnesses corroborated plaintiff's claim that Arrendondo intentionally pushed her.

Plaintiff initially refused to give HCA a written statement regarding the J-closet incident, notwithstanding requests from both Brakebill and Ramos. When plaintiff finally gave her statement, ten days after the incident, it read in its entirety: "I Emma Wright was assaulted by a Crew Member (Herlinda) approx 11:45 PM in the door of the Crew Members J Closet at the or inside of the Hollywood Casino."

---

[4]Plaintiff also testified at her deposition that she believed Arrendondo had been following her outside of work during 2000 because she saw a red car driving in the same direction when she left work two or three times a week. Plaintiff did not know if Arrendondo was driving the car that was allegedly following her, however. Moreover, plaintiff also stated that she has received calls from a Spanish speaking person at her home, though is unaware whether the person calling her home was male or female. Plaintiff complained to Supervisor Jeffries that Arrendondo was following her at work and that she believed Arrendondo was calling her at home because the person "would speak [Arrendondo's] language."

8

At an October 26, 2000, meeting between Brakebill, Casas and plaintiff, Brakebill told plaintiff that all of the witnesses had corroborated Arrendondo's account of the J-closet incident. Based on the witnesses' statements and the meeting with plaintiff, Brakebill concluded that Arrendondo had not intentionally pushed plaintiff. Casas did not consult video surveillance tapes because he knew that the camera was not pointing to the area where plaintiff was allegedly pushed.

Purse Policy and Garbage Incident

HCA has a policy prohibiting employees from carrying purses and personal belongings to their work stations and/or work areas. Plaintiff testified in her deposition that she is aware of that policy.

During the weekend of October 20-22, 2000, plaintiff had her purse in a plastic garbage bag in her working area. When her co-worker, Albert Pickett, an African-American male, told her that it was time to close down the boat for the evening and asked if she was finished cleaning the floor, plaintiff said "okay," put the garbage bag containing the purse on top of her vacuum cleaner, and left to check some machines. While she was away, Pickett threw out the garbage bag. By the time she returned and went to look for her purse, the garbage can containing her purse had already been emptied.

Plaintiff notified Supervisor Jeffries about the incident, and he then asked another employee to accompany plaintiff to the "big dumpster" to look for her purse. Plaintiff and Pickett dispute whether he accompanied her to the big dumpster, as well. Although Pickett testified at his deposition that he did not see plaintiff's purse inside the garbage bag, and thought that the bag only contained trash, plaintiff accused Pickett of "stealing" her purse.

9

On October 25, 2000, HCA gave plaintiff a record of counseling indicating that she was being suspended without pay because she "[f]ailed to comply with investigation [of the J-closet incident]. Insubordinate to management and supervisors. Brought purse to 4th floor casino concealed in garbage bag. Purses are not allowed on casino floor." Plaintiff signed the record of counseling and did not write anything in the area for employee comments.

Bathroom Incident

Plaintiff testified at her deposition that Crew Leader Padilla walked in on her on two occasions while she was using HCA's unisex employee bathroom. According to plaintiff, Padilla unlocked the door on her. Casas testified, however, that the locks on the door of that bathroom do not have keyholes on the outside, making it impossible for someone to walk in on another person who has locked the door from the inside.

Plaintiff testified that on both occasions, Padilla immediately walked out and closed the door. He did not say anything to plaintiff and did not touch her. After the second bathroom incident, plaintiff complained to Supervisors Ramos and Jeffries. She did not complain to human resources or Brakebill and did not use the employee help line, however.

Plaintiff's Dress Code Violation

HCA requires all employees to button all buttons on their shirt, including collar and wrist buttons. Plaintiff was aware of this policy, though testified in her deposition that she did not always have the top button of her shirt buttoned.

On October 14, 2000, plaintiff received written counseling about her failure to button her top shirt button. Crew Leader Padilla and Pickett also received written warnings for keeping their top shirt buttons unbuttoned.

10

Plaintiff's Failure to Transfer Claim

Section 2.17 of HCA's Handbook states, "If you are interested in promotion and/or transfer opportunities please contact your Human Resources Representative. Your qualifications, job performance, work record, and attendance will be reviewed and, if satisfactory, your name and job interest will be noted for future consideration."

On July 25, 2000, plaintiff applied for a position with the security department. She was interviewed on August 8, 2000 by Carrie Czerwinski for a security agent position. Plaintiff does not have any security or customer service experience, and Czerwinski indicated on plaintiff's interview form that she did not believe that plaintiff had the communication skills or experience necessary for the security agent position. The security agent position was not offered to plaintiff.

Plaintiff testified at her deposition that she does not have any reason to believe that HCA failed to transfer her because of her age, sex, or race. She testified that HCA has "lots" of female security officers, as well as African-American security officers and security officers over the ages of 40, 50 and 60.

Plaintiff's Age Discrimination Claim

At her deposition, plaintiff testified that Crew Leader Padilla asked her why she was working at her age, and told her she should be traveling. She also stated that, in Supervisor Ramos' presence, Padilla asked plaintiff how much money she received from her federal pension. According to plaintiff, she responded by telling him that it was none of his business, and telling him that she did not care how much money he made from his second job. According to plaintiff, Ramos and Padilla laughed, and Padilla did not ask her any more questions about her pension after that incident.

11

Plaintiff's Complaints About Job Assignments

Supervisors Ramos and Jeffries rotated cleaning assignments among employees. Plaintiff complained to Jeffries that she thought her assignments were more difficult than other employee's assignments. Although Jeffries offered to give plaintiff a position in the Pavilion area, which she considered easier, she declined the position because it was too silent in the Pavilion and she liked to be "where the action was."

Plaintiff believes that she was assigned vacuuming and "dirty jobs" because of her sex, though she never voiced this complaint to the human resources department or to Manager Brakebill. Moreover, at her deposition, plaintiff testified that she is not aware of losing any overtime opportunities, or being deprived of any benefits, because of her age, sex or race.

After obtaining a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"), plaintiff initiated the instant suit. Her five-count amended complaint seeks damages and back pay for race discrimination, sex discrimination, age discrimination, retaliation, and failure to transfer. Specifically, in Count I, plaintiff alleges that she "was subject to unwelcome harassment because of her race" and that "similarly situated Hispanic employees were treated more favorably" than she. In Count II, plaintiff maintains that she was "subject to unwelcome sexual harassment." Count III alleges that plaintiff was "fired, at least in part, because of her age." In Count IV, plaintiff alleges that she complained to Brakebill, Ramos and Jeffries that she was being discriminated against on the basis of her age, sex and race, and that these complaints led to her termination. In Count V, plaintiff alleged that the security agent position for which she applied was ultimately filled by a male, individual under the age of 40, or a non-African-American.

With this factual background in mind, the court turns to the law governing the instant dispute.

## DISCUSSION

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Plaintiff has not produced direct evidence that establishes defendant discriminated against her because of her sex, race or age. Accordingly, to establish her prima facie case of discrimination with respect to her termination, plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. See McDonnell Douglas Corp. v. Green, 411 U.S. 792,

93 S.Ct. 1817 (1973); Koski v. Standex Intern. Corp., 307 F.3d 672, 676 (7th Cir. 2002); Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002).

Once plaintiff has met her burden, the employer must then produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. If the employer offers such a reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is a pretext. Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir. 1998).

The factual record undermines plaintiff's argument that she was meeting her employer's legitimate expectations at the time of her discharge, and there is no evidence that similarly situated employees were treated more favorably than plaintiff. Moreover, plaintiff has not demonstrated that defendant's proffered reason for her termination is pretextual. Accordingly, defendant is entitled to summary judgment on plaintiff's Title VII and ADEA claims relating to her termination.

To begin, HCA's records demonstrate that plaintiff accrued a total of ten absences in a twelve-month period, including two no call/no shows. Plaintiff was warned on several occasions about her absences, and had already been terminated previously (and then reinstated) for accruing ten absences within a year. As stated in HCA's Lost Time Policy, with which plaintiff is familiar, nine absences or two no call/no shows within a twelve-month period is grounds for termination. Accordingly, no reasonable jury could conclude that plaintiff was meeting her employer's legitimate expectations at the time she was terminated.

Moreover, plaintiff has not adduced any evidence of similarly situated employees who were treated more favorably. To demonstrate that another employee is "similarly situated,"

14

plaintiff must show that there is someone who is directly comparable to her in all material respects. Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). In satisfying this burden, the plaintiff ordinarily must show that the two employees dealt with the same supervisor and were subject to the same standards. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-618 (7th Cir. 2000). The record reflects that between January 1, 1998, and January 2, 2001, 49 employees in HCA's housekeeping department were terminated for violating the Lost Time Policy. Of these employees, approximately 21 were Hispanic; 37 were under 40 years of age; and 22 were male. Thus, plaintiff has failed to establish a prima facie case of discrimination on the basis of race, age or gender.

Even if the court concluded otherwise, defendant would still be entitled to summary judgment because plaintiff has not produced evidence tending to establish that defendant's stated reasons for terminating her employment are pretextual. The record reflects that Brakebill and Casas reviewed plaintiff's personnel records before terminating her employment and honestly believed that she had violated the Lost Time Policy, thus negating an inference of pretext. Assuming arguendo that plaintiff's personnel records were somehow inaccurate would not alter the court's conclusion. See Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997) ("[T]he question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest.") (Emphasis in original; internal quotations and citations omitted.).

Moreover, the court notes that Casas, who fired plaintiff, also interviewed her and recommended that HCA hire her in 1999, further supporting an inference of non-discrimination. See, e.g., Roberts v. Separators, Inc., 172 F.3d 448 (7th Cir. 1999); Chiaramonte v. Fashion Bed

15

Group, 129 F.3d 448 (7th Cir. 1999). Thus, the court grants defendant's motion for summary judgment with respect to plaintiff's ADEA & Title VII claims relating to her termination.

Count V, in which plaintiff appears to assert a claim for discriminatory failure to transfer her to a security agent position, also fails. Carrie Czerwinski, who interviewed plaintiff for the position, concluded that she lacked both the experience and communication skills required for the job. Indeed, plaintiff does not dispute that she lacks security and customer service experience. Thus, plaintiff was not qualified for the position and no reasonable jury could conclude that she was denied the position on the basis of sex, race or age.[5]

Plaintiff's remaining allegations of harassment based on sex, race and age also fail. Plaintiff's claim that HCA failed to adequately investigate the pushing incident between plaintiff and Arrendondo does not constitute racial harassment. According to all accounts, HCA promptly investigated the incident, deterred only by plaintiff's unwillingness to provide her own statement to management. Even assuming that plaintiff's account of events is true, and that co-worker Arrendondo did in fact "harass" her, HCA's ensuing investigation, taken together with plaintiff's lack of cooperation in that investigation, persuade the court that HCA is not liable. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-765 (1998).

Similarly, plaintiff's factual allegations relating to the purse incident and her subsequent one-day suspension do not constitute legal harassment, retaliation, or discrimination. When plaintiff complained to Jeffries that Pickett had thrown away her purse, which she had hidden in

---

[5]In her deposition, plaintiff admitted that she did not have any reasons to believe that HCA failed to transfer her because of her age, sex or race, and noted that the HCA has female security officers, African-American security officers, as well as security officers over the ages of 40, 50 and 60.

a garbage bag, Jeffries directed another employee to accompany plaintiff to HCA's large trash compactor to try and recover the purse. Although regrettable, this incident does not rise to the level of actionable harassment, retaliation or discrimination, and no reasonable jury could conclude that defendant failed to respond appropriately to the situation. As for her suspension, plaintiff has not adduced any evidence that other employees have been treated more favorably in response to violations of HCA's rule prohibiting the carrying of personal belongings in work areas. Defendant is therefore entitled to summary judgment on that claim as well.

HCA's issuance of a written warning to plaintiff regarding the dress code does not constitute harassment or retaliation, either. To begin, a warning does not constitute an "adverse action" for purposes of a discrimination or retaliation claim. Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 654 (7th Cir. 2001). Further, the evidence shows that other employees, including Hispanic and male employees, were also issued written warnings for violating the dress code. Accordingly, no reasonable jury could conclude that the written warning constituted harassment or retaliation.

Plaintiff's allegations regarding the assignment of less desirable work assignments also fails. Aside from failing to produce evidence that other similarly situated employees were treated more favorably, the record demonstrates that plaintiff refused to accept an alternate work assignment that was offered to her in response to her complaints. To the extent that plaintiff's less desirable work assignments are properly characterized as an adverse employment action, which is a dubious characterization at best, the reality is that plaintiff declined the opportunity to rectify the situation. Heeding the Seventh Circuit's admonition that a court shall not "sit as a super-personnel department over employers scrutinizing and second-guessing every decision they

17

make," Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002), the court concludes that defendant is entitled to summary judgment on this claim, as well.

Plaintiff's claim of sexual harassment arising from two incidents in which Padilla allegedly walked in on her in the bathroom is also not actionable. According to plaintiff's deposition testimony, Padilla did not touch her and did not say anything to her, and immediately walked out and shut the door. Setting aside the factual dispute regarding whether or not Padilla could have unlocked the door from the outside, the court concludes that his actions were not sufficiently severe to constitute sexual harassment. See Adusumilli v. City of Chicago., 164 F.3d 353, 361-362 (7th Cir. 1998) (unwanted touching of the plaintiff's buttocks and arm, as well as staring at her breasts, did not constitute actionable sexual harassment).

Plaintiff's final allegations pertaining to statements purportedly made by Padilla regarding plaintiff's age are similarly unavailing. Padilla's comments regarding plaintiff's age and pension, taken at face value, do not suggest any animus toward plaintiff and thus do not give rise to an inference of age discrimination. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 715 (7th Cir. 1999) (decisionmaker's comment, "what would you think if we gave you early retirement, with some extra compensation because of your age," did not give rise to inference of age discrimination). Accordingly, the court grants defendant's motion for summary judgment on this claim, as well.

## CONCLUSION

In conclusion, although plaintiff has identified a number of incidents in which she believes defendant made incorrect decisions regarding her employment, the court concludes after a thorough review of the record that the record fails to demonstrate that those decisions were

18

based on her race, age or sex. Defendant's motion for summary judgment is granted in its entirety.

**ENTER:** **April 14, 2003**

Robert W. Gettleman
United States District Judge